# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

LUCILLE S. TAYLOR,

       Plaintiff,

v

DENNIS M. BARNES, President of the State
Bar of Michigan Board of Commissioners;
ROBERT J. BUCHANAN, President-Elect of
the State Bar of Michigan Board of
Commissioners;
DANA M. WARNEZ, Vice President of the
State Bar of Michigan Board of
Commissioners;
JAMES W. HEATH, Secretary of the State
Bar of Michigan Board of Commissioners;
DANIEL D. QUICK, Treasurer of the State
Bar of Michigan Board of Commissioners,

       Defendants.

Case No.: 1:19-cv-00670

HON. ROBERT J. JONKER

**PLAINTIFF'S FRCP 56 MOTION
AND BRIEF FOR
SUMMARY JUDGMENT**

Oral Argument Requested

---

## PLAINTIFF'S MOTION AND BRIEF IN SUPPORT
## FOR SUMMARY JUDGMENT UNDER FRCP 56

Oral Argument Requested

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................ ii

INDEX OF AUTHORITIES ....................................................................................... iii

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND FACTS ................................................................................... 2

    A.    SBM Dues and Membership ...................................................................... 2

    B.    SBM Public Speech and Advocacy ............................................................ 3

    C.    SBM Governance ........................................................................................ 5

    D.    The Attorney Grievance Commission and Attorney Discipline Board ........... 6

III.   THE LAW .......................................................................................................... 8

    A.    *Keller* and its predecessors ........................................................................ 8

III.   ANALYSIS ....................................................................................................... 22

# INDEX OF AUTHORITIES

**Cases**

*Abood v. Detroit Board of Education*, 431 U.S. 209 (1977) .................................................. passim

*Ellis v. Brotherhood of Railway, Airline & Steamship Clerks*, 466 U.S. 435 (1984)....... 15, 16, 21

*F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313-4 (1993).......................................... 11

*Harris v Quinn*, 573 U.S. 616 (2014) ................................................ 12, 17, 18, 19, 22

*In re Petition for a rule Change to Create a Voluntary State Bar of Nebraska*, 286 Neb. 1018, 1035 (2013).................................................................................................................... 1

*International Association of Machinists v. Street*, 367 U.S. 740 (1961) .............. 11, 12, 13, 14, 17

*Janus v. AFSCME,__U.S.__;* 138 S. Ct. 2448 (2018) .......................................................... passim

*Keller v. State Bar of California*, 496 U.S. 1 (1990) ............................................................. passim

*Knox v. Service Employees International Union, Local 1000*, 567 U.S. 298 (2012) 16, 17, 21, 22, 26

*Lathrop v Donohue*, 367 U.S. 820 (1961) ........................................................................... passim

*McCullen v. Coakley*, 573 U.S. 464, 495 (2014). ...................................................................... 26

*Railway Employees v. Hanson*, 351 U.S. 225 (1956) ............................................................ passim

*Teachers v. Hudson*, 475 U.S. 292 (1986)................................................................................ 16

*United States v United Foods,* 533 U.S. 405 (2001)............................................................ 21, 23

**Statutes**

MCL 600.901 ............................................................................................................................ 3

**Rules**

RCSBM 4(A) ............................................................................................................................. 3

RCSBM 9.................................................................................................................................. 6

**Regulations**

Michigan Supreme Court Administrative Order No. 2004-01 ...................................................... 4

# I. INTRODUCTION

The First Amendment protects free speech, the right to refrain from speaking, and the right to be free from compelled speech. It similarly protects a right to free association, and a right to be free from compelled association. The 14th Amendment extends these protections to the states. A majority of states, approximately thirty-one, require that attorneys in their states, as a condition of practicing law, must belong to a state bar and pay membership dues to that state bar. These are called "integrated bars." While a majority of states, including Michigan, require membership and payment to an integrated bar, these mandatory states only include a minority of the nation's lawyers. Roughly 60% of the United States' lawyers are free from these mandatory requirements of integrated bars.[1] This is because a majority of the most populous states do not have mandatory integrated bars.

---

[1] This data comes from state-by-state census from the American Bar Association's 2019 National Lawyer Population Survey annual data. https://www.americanbar.org/content/dam/aba/administrative/market_research/national-lawyer-population-by-state-2019.pdf Last accessed May 13, 2020.
Plaintiff's review of this state-by-state data indicates that 60% of lawyers practice in a non-integrated bar state. These non-integrated bar states are: Arkansas, California, Colorado, Connecticut, Delaware, Illinois, Indiana, Iowa, Kansas, Maine, Maryland, Massachusetts, Minnesota, New Jersey, New York, Ohio, Pennsylvania, Tennessee, and Vermont. (See the Joint Statement of Material Facts at paragraph 63. A spreadsheet with these calculations is attached as Exhibit 1 to this brief.)
Nebraska, while still a mandatory integrated bar, has, by order of its supreme court, reduced fees from approximately $300 to $100. While it did not abolish the integrated bar, it restricted what mandatory fees can be used for to a greater extent than did *Keller v. State Bar of California*, 496 U.S. 1 (1990). *In re Petition for a rule Change to Create a Voluntary State Bar of Nebraska*, 286 Neb. 1018, 1035 (2013), held: "In our view, the best solution is to modify the court's rules creating and establishing the Bar Association (and other related rules) to limit the use of mandatory dues, or assessments, to the regulation of the legal profession. This purpose clearly includes the functions of (1) admitting qualified applicants to membership in the Bar Association, (2) maintaining the records of membership, (3) enforcing the ethical rules governing the Bar Association's members, (4) regulating the mandate of continuing legal education, (5) maintaining records of trust fund requirements for lawyers, and (6) pursuing those who engage in the unauthorized practice of law."

A previous Supreme Court opinion, *Keller v. State Bar of California*, 496 U.S. 1 (1990), held that the integrated bars could require membership and payment, but that mandatory membership and fees could only be used for public speech and advocacy for matters which were closely related to the regulation and disciplining of the profession. In other words, lawyers could be made to support speech and an organization which directly affected their own profession and lives, but could not be compelled to join or to fund speech for controversial matters that were, perhaps, further afield and not directly related to their profession – like gun control or nuclear disarmament. *Keller* was based on what has now been pronounced to be a faulty standard of review or scrutiny, and relied on precedents in other cases that have since been overturned by our Supreme Court in *Janus v. AFSCME*, __ U.S. __; 138 S. Ct. 2448, 2463 (2018). *Keller* has therefore been overturned as both its foundations and the standard it employed for reviewing free speech and association claims has been overruled. Therefore, *Keller* is no longer good or controlling law, and the mandatory integrated bar with its requisite membership and dues cannot stand when the proper level of scrutiny is applied.

## II.     BACKGROUND FACTS

### A.     SBM Dues and Membership

Plaintiff is challenging the mandatory membership and fees required to be paid to the State Bar of Michigan ("SBM") for non-disciplinary matters. To this end, Plaintiff challenges two-thirds of the accounts which make up the mandatory dues and membership. Plaintiff's dues amounts, as well as all members' dues amounts, are set by the Supreme Court of Michigan and are allocated into three separate amounts for: (1) the Attorney Grievance Commission and the Attorney Discipline Board, (2) the Client Protection Fund administered by the State Bar, and (3)

general membership and State Bar expenses.[2] (See the Joint Statement of Material Facts, "JSMF," Docket No. 16, at paragraph 22.) Plaintiff is challenging the second and third items, but not the first item for the Attorney Grievance Commission and the Attorney Discipline Board. This is a facial challenge to these requirements based on the state of the law as it stands after *Janus*, *supra*.

The State Bar of Michigan is a public body corporate. MCL 600.901. (See JSMF paragraph 2.) The State of Michigan requires attorneys to become and stay members of the State Bar of Michigan as a condition precedent to being licensed to practice law in Michigan. MCL 600.901. (See JSMF paragraph 3.) Becoming and staying a member of the State Bar of Michigan requires that lawyers, including Plaintiff, pay dues to the State Bar of Michigan. (See JSMF paragraph 4.)

Plaintiff is a member of the State Bar of Michigan, and her dues have been paid through 2020. (See JSMF paragraph 4.) Plaintiff has paid her dues since becoming a practicing attorney in Michigan and is not in arrears. (See JSMF paragraph 7.) The named Defendants are officers of the State Bar of Michigan acting solely in their official capacities and acting under the color of state law to enforce laws requiring membership in and paying dues to the State Bar of Michigan. (See JSMF paragraph 8.)

## B.     SBM Public Speech and Advocacy

The State Bar of Michigan advocates positions on legislation, policies, or initiatives that regulate or directly affect the regulation of the legal profession. Plaintiff does not challenge that, at all times relevant to this lawsuit, the State Bar of Michigan has constrained itself to public advocacy that was previously held to be allowable under *Keller,* 496 U.S. at 6. (See JSMF paragraph 40.) This allowable advocacy has been described by the Michigan Supreme Court as:

---

[2] In 2019, the last year dues were set, these amounts were at (1) $120 for the Attorney Grievance Commission and the Attorney Discipline Board, (2) $15 for the Client Protection Fund, and (3) $180 for membership and general SBM expenses.

I. IDEOLOGICAL ACTIVITIES GENERALLY.
The State Bar of Michigan shall not, except as provided in this order, use the dues of its members to fund activities of an ideological nature that are not reasonably related to:
(A) the regulation and discipline of attorneys;
(B) the improvement of the functioning of the courts;
(C) the availability of legal services to society;
(D) the regulation of attorney trust accounts; and
(E) the regulation of the legal profession, including the education, the ethics, the competency, and the integrity of the profession.

***

II. ACTIVITIES INTENDED TO INFLUENCE LEGISLATION.
(A) The State Bar of Michigan may use the mandatory dues of all members to review and analyze pending legislation.
(B) The State Bar of Michigan may use the mandatory dues of all members to provide content-neutral technical assistance to legislators…;
(C) No other activities intended to influence legislation may be funded with members' mandatory dues, unless the legislation in question is limited to matters within the scope of the ideological-activities requirements in Section I.

Michigan Supreme Court Administrative Order No. 2004-01. (See JSMF paragraph 39.) Plaintiff is not alleging that the State Bar of Michigan has exceeded these parameters.

The advocacy of the State Bar of Michigan is not promulgated nor published with an indication that it has come from the Michigan Supreme Court, the state judiciary, the governor, or the legislature. It is always attributed to the State Bar of Michigan. (See JSMF paragraph 41.)

Plaintiff's dues are paid into the State Bar of Michigan treasury, and spent as authorized by the Board of Commissioners: "All dues are paid into the State Bar treasury and maintained in segregated accounts to pay State Bar expenses authorized by the Board of Commissioners and the expenses of the attorney discipline system within the budget approved by the Supreme Court, respectively." (See JSMF paragraph 23.) Not all State Bar of Michigan members are required to pay the non-disciplinary portion of expenses. A person who has been a member of the State Bar

for at least 50 years shall not be assessed general expenses, but shall pay the full amount assessed other members for the client security fund and the discipline agencies.  (See JSMF paragraph 25.)

C.      **SBM Governance**

The Representative Assembly is the final policy-making body of the State Bar of Michigan. (See JSMF paragraph 13.)  The elected representatives of the Representative Assembly are elected by member lawyers in each judicial circuit.  The judicial circuits are the election districts. Each judicial circuit is entitled to one representative. The remaining seats are to be apportioned among the circuits on the basis of lawyer population.  (See JSMF paragraph 14.)  The Representative Assembly is comprised of 142 elected representatives and 8 commissioner representatives who are the members of the executive committee of the Board of Commissioners. The Board of Commissioners, in turn, is comprised of 20 elected members, and 5 members appointed by the Supreme Court.   At no time will more than 5 members of the 150 representatives to the Representative Assembly (3.333% of the total) be appointed by the Supreme Court.  (See JSMF paragraph 15.)  No person holding judicial office may be elected or appointed an officer of the Representative Assembly.  No person holding judicial office may be elected or appointed an officer of the Board of Commissioners.  (See JSMF paragraph 16.)  The Board of Commissioners elects its officers from among its member commissioners.  (See JSMF paragraph 17.)  Three percent or more of the active members of the State Bar may, by written petition, require consideration by the Representative Assembly of any question of public policy germane to the function and purposes of the State Bar.  (See JSMF paragraph 18.)  Twenty-five or more active members of the State Bar of Michigan may file a written petition with the secretary at the principal office of the State Bar no later than 90 days before the annual meeting of the State Bar, to require the convening of a congress of the active members of the State Bar in conjunction with the annual meeting to consider

the subject matter raised in the petition. One hundred active members constitute a quorum. (See JSMF paragraph 19.)

Each year the Board of Commissioners causes to be presented an audited financial statement of the receipts and expenditures of the State Bar of Michigan for the fiscal year. Such a statement is filed with the Clerk of the Supreme Court and is published in the January issue of the official publication of the SBM. (See JSMF paragraph 20.) The Board of Commissioners of the State Bar of Michigan adopts the budget for the State Bar. (See JSMF paragraph 21.)

**D.      The Attorney Grievance Commission and Attorney Discipline Board**

The Attorney Grievance Commission and the Attorney Discipline Board are separate entities which are governed separately and are not funded out of the State Bar of Michigan's membership fees. Rather, the State Bar of Michigan collects and forwards a specific fee to those two entities for their specific functions. All fees are collected and paid into the State Bar treasury and are maintained in segregated accounts to pay State Bar expenses authorized by the Board of Commissioners and the expenses of the attorney discipline system. Plaintiff is not challenging fees related to these two attorney-discipline entities. (See JSMF paragraph 65.)

The Attorney Grievance Commission is the prosecution arm of the Supreme Court. Attorney Grievance Commission commissioners are appointed solely by the Supreme Court. The Supreme Court chooses a chairperson and a vice-chairperson. Other officers are chosen by the commissioners appointed by the Supreme Court. (See JSMF paragraphs 67 and 68.)

The Attorney Discipline Board is the adjudicative arm of the Supreme Court for discharge of its exclusive constitutional responsibility to supervise and discipline Michigan attorneys and those temporarily admitted to practice under MCR 8.126 or otherwise subject to the disciplinary authority of the Supreme Court. (See JSMF paragraph 69.) The board consists of 6 attorneys and

3 laypersons appointed solely by the Supreme Court. The Supreme Court shall designate from among the members of the board a chairperson and a vice-chairperson. Other officers are chosen by the board from among its Supreme Court-appointed members. (See JSMF paragraph 71.)

E.     **The Client Protection Fund**

The State Bar of Michigan Client Protection Fund reimburses certain clients who have been victimized by lawyers who violate the profession's ethical standards and misappropriate funds entrusted to them. (See JSMF paragraph 28.) The Client Protection Fund does not reimburse all such victimized clients nor, when it does reimburse these clients, does it always fully reimburse those clients. It awards partial reimbursements, and sometimes no reimbursements. (See JSMF paragraph 33.) Any reimbursement is at the discretion of the Board of Commissioners of the State Bar of Michigan. (See JSMF paragraph 32.) The purpose of the Client Protection Fund "is to promote public confidence in the administration of justice and integrity of the legal profession by reimbursing losses caused by the dishonest conduct of lawyers admitted and licensed to practice law in Michigan. Reimbursable losses must have occurred in the course of the lawyer-client or other fiduciary relationship between the lawyer and claimant…" The Client Protection Fund does not operate as an insurance policy. No client who submits a request for reimbursement has a right to such reimbursement. The Client Protection Fund's rules state: "REIMBURSEMENT FROM FUND IS A MATTER OF GRACE" and, "No person shall have the legal right to reimbursement from the Fund whether as a claimant, third party beneficiary or otherwise." (See the Client Fund Rules, Rule 13, attached as Exhibit B to JSMF paragraph 30.)

**III.    THE LAW**

**A.    *Keller* and its predecessors**

Until 2018, California had been an integrated bar state.[3]  In the 1980s, members of the State Bar of California, including plaintiff Eddie Keller, challenged the fact that their dues were used to promote political causes that they did not agree with.  The description and function of the State Bar of California, as described in *Keller,* is almost identical to that of the SBM:

> The State Bar is an organization created under California law to regulate the State's legal profession. It is an entity commonly referred to as an "integrated bar"- an association of attorneys in which membership and dues are required as a condition of practicing law in a State. Respondent's broad statutory mission is to "promote 'the improvement of the administration of justice.'" The association performs a variety of functions such as "examining applicants for admission, formulating rules of professional conduct, disciplining members for misconduct, preventing un-lawful practice of the law, and engaging in study and recommendation of changes in procedural law and improvement of the administration of justice."

*Keller*, U.S. at 4-5 (internal citations omitted).

In evaluating the California bar, the *Keller* court compared the bar's status to that of a labor union, rather than that of a state agency.  This followed from a previous opinion on the subject of compelled financial support for a state bar in Wisconsin, *Lathrop v Donohue*, 367 U.S. 820 (1961).

---

[3] In 2018, after allegations of scandal and excessive spending, California enacted legislation splitting its bar into two groups.  One group, which is still mandatory, focuses on attorney admissions and discipline – the State Bar of California.  The second group, the California Lawyers Association, is a voluntary nonprofit, and this focuses on improving the profession and putting forth new initiatives.  The California Lawyers Association has also taken on the job of hosting the various specialty sections. See the February 4, 2019 ABA Journal, "California Split: 1 year after nation's largest bar became 2 entities, observers see positive change": "The bill, SB 36, mandated that the bar's 16 specialty law sections depart the agency and become an independent nonprofit entity. … The sections, which focus on topics ranging from business law to environmental law, are best known for providing members with educational programming and networking opportunities. They were jettisoned to CLA along with the California Young Lawyers Association." http://www.abajournal.com/web/article/california-split-1-year-after-californias-state-bar-became-2-entities-observers-see-positive-changes last accessed May 13, 2020:

In *Lathrop*, the court in turn relied on an opinion deciding an earlier railway union matter, *Railway Employees v. Hanson*, 351 U.S. 225 (1956). *Lathrop* analogized:

> In our view the case presents a claim of impingement upon freedom of association no different from that which we decided in [*Hanson*]. We there held that … the Railway Labor Act ... did not on its face abridge protected rights of association in authorizing union-shop agreements between interstate railroads and unions of their employees conditioning the employees' continued employment on payment of union dues, initiation fees and assessments.... In rejecting Hanson's claim of abridgment of his rights of freedom of association, we said, 'On the present record, there is no more an infringement or impairment of First Amendment rights than there would be in the case of a lawyer who by state law is required to be a member of an integrated bar.'

*Lathrop*, 367 U.S. at 842 (plurality opinion). *Keller* followed *Lathrop* in this regard.

> Justice Harlan, joined by Justice Frankfurter [in a *Lathrop* concurring opinion], similarly concluded that "[t]he Hanson case ... decided by a unanimous Court, surely lays at rest all doubt that a State may constitutionally condition the right to practice law upon membership in an integrated bar association, a condition fully as justified by state needs as the union shop is by federal needs."

*Keller*, 496 U.S. at 8-9.

For this reason, to understand *Keller*, we must go back further and review how the Supreme Court came to decide the union fees and integrated bar cases. These predicates show how the *Keller* court came to the holding that it did.

The first of these parallel labor mandatory-fee cases was *Railway Employees v. Hanson*, 351 U.S. 225 (1956). *Hanson* was brought by railroad employees challenging the requirement that they join the union and pay dues, or lose their job. This was called a "union shop" agreement: "Under the terms of the union shop agreement all employees of the railroad, as a condition of their continued employment, must become members of the specified union within 60 days and thereafter maintain that membership. It is alleged that failure on their part to join the union will mean the loss of their employment together with seniority, retirement, pension, and other rights." *Hanson*, 351 U.S. at 227. *Hanson* held that such a requirement was allowed because the federal statutes

permitted it. The question of whether or not such compulsion violated First Amendment rights (as well as Fifth Amendment rights) was raised, but the question was not evaluated under a First Amendment analysis because there was no record developed on the matter. Therefore, the matter was treated only as a question of whether or not Congress acted within its authority to regulate interstate commerce:

> *On the present record, there is no more an infringement or impairment of First Amendment rights than there would be in the case of a lawyer who by state law is required to be a member of an integrated bar.* It is argued that compulsory membership will be used to impair freedom of expression. But that problem is not presented by this record. Congress endeavored to safeguard against that possibility by making explicit that no conditions to membership may be imposed except as respects 'periodic dues, initiation fees, and assessments.' If other conditions are in fact imposed, or if the exaction of dues, initiation fees, or assessments is used as a cover for forcing ideological conformity or other action in contravention of the First Amendment, this judgment will not prejudice the decision in that case. For we pass narrowly on s 2, Eleventh of the Railway Labor Act. We only hold that the requirement for financial support of the collective-bargaining agency by all who receive the benefits of its work is within the power of Congress under the Commerce Clause and does not violate either the First or the Fifth Amendments.

*Hanson*, 351 U.S. at 238 (emphasis added). Note that it is here where the integrated bars and forced union membership or payment were first linked.

What *Hanson* stated was that there was no infringement of First Amendment rights (or at least no more than integrated bar dues), yet *Hanson* held this without articulating a standard it was using to determine whether or not a First Amendment violation occurred. It can be inferred that what the *Hanson* court used was the "rational basis" standard. Under such a standard, the question is merely one of whether or not Congress acted within its given authority and had a valid reason for enacting the statute. The standard has been described as:

> Whether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably

conceivable state of facts that could provide a rational basis for the classification. Where there are "plausible reasons" for Congress' action, "our inquiry is at an end."

*F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313-4 (1993) (internal citations omitted).  If a legislature had a "plausible reason" for its enactment, the court would uphold the requirement, and this is what it did in *Hanson*:

> The choice by the Congress of the union shop as a stabilizing force seems to us to be an allowable one. Much might be said pro and con if the policy issue were before us. Powerful arguments have been made here that the longrun interests of labor would be better served by the development of democratic traditions in trade unionism without the coercive element of the union or the closed shop.
> ***
> But the question is one of policy with which the judiciary has no concern, as Mr. Justice Brandeis would have been the first to concede. Congress, acting within its constitutional powers, has the final say on policy issues. If it acts unwisely, the electorate can make a change. The task of the judiciary ends once it appears that the legislative measure adopted is relevant or appropriate to the constitutional power which Congress exercises. The ingredients of industrial peace and stabilized labor-management relations are numerous and complex. They may well vary from age to age and from industry to industry. What would be needful one decade might be anathema the next. The decision rests with the policy makers, not with the judiciary.

*Hanson*, 351 U.S. at 233-4.

After *Hanson*, the matter of mandatory membership and dues or fees returned to the Supreme Court in two cases.  The aforementioned *Lathrop*, involving an integrated bar, and *International Association of Machinists v. Street*, 367 U.S. 740 (1961), a union matter.  *Lathrop* was argued the day after *Street*, and the decision was handed down on the same day as *Street*.  The two would later be described by the Court as "companion case[s]" in the significant Supreme Court case, *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977).

As discussed above, *Lathrop*, discussing the court's rejection of Hanson's claim of abridgment of his rights of freedom of association, said: 'On the present record, there is no more an infringement or impairment of First Amendment rights than there would be in the case of a

lawyer who by state law is required to be a member of an integrated bar.' *Lathrop*, 367 U.S. at 842. However, *Lathrop* was a plurality decision, and failed to reach a consensus on the First Amendment question. In a later opinion, the Court would describe *Lathrop*'s holding this way: "The only proposition about which a majority of the Court in *Lathrop* agreed was that the constitutional issues should be reached. However, due to the disparate views of those five Justices on the merits and the failure of the other four Members of the Court to discuss the constitutional questions, *Lathrop* does not provide a clear holding to guide us in adjudicating the constitutional questions here presented." *Abood v. Detroit Board of Education*, 431 U.S. 209, 233, Fn. 29 (1977). The Court would later summarize *Lathrop*'s companion case *Street* and its holding in *Harris v. Quinn*, 573 U.S. 616 (2014):

> Five years [after *Hanson*], in *Street, supra,* the Court considered another case in which workers objected to a union shop. Employees of the Southern Railway System raised a First Amendment challenge, contending that a substantial part of the money that they were required to pay to the union was used to support political candidates and causes with which they disagreed. A Georgia court enjoined the enforcement of the union-shop provision and entered judgment for the dissenting employees in the amount of the payments that they had been forced to make to the union. The Georgia Supreme Court affirmed. *Id.*, at 742–745, 81 S.Ct. 1784.

> Reviewing the State Supreme Court's decision, this Court recognized that the case presented constitutional questions "of the utmost gravity," id., at 749, 81 S.Ct. 1784, but the Court found it unnecessary to reach those questions. Instead, the Court construed the RLA "as not vesting the unions with unlimited power to spend exacted money." *Id.*, at 768, 81 S.Ct. 1784. Specifically, the Court held, the Act "is to be construed to deny the unions, over an employee's objection, the power to use his exacted funds to support political causes which he opposes." *Id.*, at 768–769, 81 S.Ct. 1784.

> Having construed the RLA to contain this restriction, the *Street* Court then went on to discuss the remedies available for employees who objected to the use of union funds for political causes. The Court suggested two: The dissenting employees could be given a refund of the portion of their dues spent by the union for political or ideological purposes, or they could be given a refund of the portion spent on those political purposes that they had advised the union they disapproved.

*Harris*, 573 U.S. at 632. Unlike *Hanson*, *Street* never mentioned integrated bar associations.

After *Hanson*, *Street*, and *Lathrop*, but before *Keller*, the subject of mandatory dues being a potential First Amendment violation returned to the Supreme Court with *Abood, supra*. *Abood* dealt with mandatory fees which public-sector employees were required to pay to the union which represented them in the workplace, despite the employees not being members of the union.[4] In other words, mandatory fees were paid to the unions by the employees regardless of whether or not the employees wanted to be a member of the union, or whether they wanted to fund and support the union to speak on their behalf. In *Abood*, a public-sector employee who did not pay these mandatory fees could be fired, analogous to how a lawyer cannot practice without paying integrated bar dues. The plaintiff in *Abood* challenged this requirement as being a violation of his First Amendment rights. *Abood,* 431 U.S. at 213.

*Abood* held that *Hanson* and *Street* substantially answered the question about mandatory dues and First Amendment rights. "Consideration of the question whether an agency-shop provision in a collective-bargaining agreement covering governmental employees is, as such, constitutionally valid must begin with two cases in this Court that on their face go far toward resolving the issue. The cases are [*Hanson* and *Street*]." *Abood,* 431 U.S. at 217. *Abood* employed a deferential standard which looked to whether or not the state legislature had a basis for requiring mandatory payments, just as *Hanson* had looked to Congress' basis for the federal Railway Labor Act: "But the judgment clearly made in *Hanson* and *Street* is that such interference as exists is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." *Abood,* 431 U.S. at 222. The *Abood* court continued:

---

[4] *Hanson* and *Street* dealt with the federal Railway Labor Act. *Abood* dealt with a Michigan state legislative enactment which authorized mandatory dues for non-union-member employees.

Our province is not to judge the wisdom of Michigan's decision to authorize the agency shop in public employment. Rather, it is to adjudicate the constitutionality of that decision. The same important government interests recognized in the *Hanson* and *Street* cases presumptively support the impingement upon associational freedom created by the agency shop here at issue. Thus, insofar as the service charge is used to finance expenditures by the Union for the purposes of collective bargaining, contract administration, and grievance adjustment, those two decisions of this Court appear to require validation of the agency-shop agreement before us.

*Abood,* 431 U.S. at 225-6.

*Abood* allowed for mandatory fees to be extracted, but limited these fees to funding for items that were germane to collective bargaining.

We do not hold that a union cannot constitutionally spend funds for the expression of political views, on behalf of political candidates, or toward the advancement of other ideological causes not germane to its duties as collective-bargaining representative. Rather, the Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment.
There will, of course, be difficult problems in drawing lines between collective-bargaining activities, for which contributions may be compelled, and ideological activities unrelated to collective bargaining, for which such compulsion is prohibited. The Court held in *Street*, as a matter of statutory construction, that a similar line must be drawn under the Railway Labor Act, but in the public sector the line may be somewhat hazier. The process of establishing a written collective-bargaining agreement prescribing the terms and conditions of public employment may require not merely concord at the bargaining table, but subsequent approval by other public authorities; related budgetary and appropriations decisions might be seen as an integral part of the bargaining process. We have no occasion in this case, however, to try to define such a dividing line. The case comes to us after a judgment on the pleadings, and there is no evidentiary record of any kind.

*Abood*, 431 U.S. at 236.

This was the logic and precedent followed in *Keller* – it was allowable without violating the First Amendment as long as it was germane to the function which supported the government's interest. "*Abood* held that a union could not expend a dissenting individual's dues for ideological activities not 'germane' to the purpose for which compelled association was justified: collective

bargaining. Here the compelled association and integrated bar are justified by the State's interest in regulating the legal profession and improving the quality of legal services." *Keller*, 496 U.S., at 13.

One other Supreme Court opinion bears mentioning after *Abood*. *Ellis v. Brotherhood of Railway, Airline & Steamship Clerks*, 466 U.S. 435 (1984) is another labor union matter regarding mandated fees. *Ellis* followed *Abood* and dealt with employees seeking a refund for a portion of their fees which went for activities that were not germane to collective bargaining. *Ellis* recognized the First Amendment problem inherent to mandated fees but, again, treated it with the deferential standard that the practice of mandatory dues or fees was allowable if it served to promote the government's interest. It therefore allowed such "impingement" as it had already been accepted by the aforementioned line of cases:

> The First Amendment does limit the uses to which the union can put funds obtained from dissenting employees. See generally *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed. 2d 261 (1977). But by allowing the union shop at all, we have already countenanced a significant impingement on First Amendment rights. The dissenting employee is forced to support financially an organization with whose principles and demands he may disagree. "To be required to help finance the union as a collective-bargaining agent might well be thought ... to interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit." Id., at 222, 97 S.Ct., at 1793. It has long been settled that such interference with First Amendment rights is justified by the governmental interest in industrial peace. *Ibid.*; *Street*, 367 U.S., at 776, 778, 81 S.Ct., at 1805 (Douglas, J., concurring); *Hanson*, 351 U.S., at 238, 76 S.Ct., at 721. At a minimum, the union may constitutionally "expend uniform exactions under the union-shop agreement in support of activities germane to collective bargaining." *Railway Clerks v. Allen*, 373 U.S., at 122, 83 S.Ct., at 1163. The issue is whether these expenses involve additional interference with the First Amendment interests of objecting employees, and, if so, whether they are nonetheless adequately supported by a governmental interest.
>
> Petitioners do not explicitly contend that union social activities implicate serious First Amendment interests. We need not determine whether contributing money to such affairs is an act triggering First Amendment protection. To the extent it is, the communicative content is not inherent in the act, but stems from the union's

involvement in it. The objection is that these are union social hours. Therefore, the fact that the employee is forced to contribute does not increase the infringement of his First Amendment rights already resulting from the compelled contribution to the union. Petitioners may feel that their money is not being well-spent, but that does not mean they have a First Amendment complaint.

The First Amendment concerns with regard to publications and conventions are more serious; both have direct communicative content and involve the expression of ideas. Nonetheless, we perceive little additional infringement of First Amendment rights beyond that already accepted, and none that is not justified by the governmental interests behind the union shop itself.

*Ellis*, 466 U.S. at 455-6.

It is here that our jurisprudence was set for *Keller* to hold as it did that integrated bar dues and association did not violate the First Amendment where these dues were for a purpose related to the mission of the bar association, as given to it by the state. However, in time, the Supreme Court began to question what had gone before in *Hanson*, *Street*, *Lathrop*, and *Abood*. The first case to call into question this previous line of cases was *Knox v. Service Employees International Union, Local 1000*, 567 U.S. 298 (2012). *Knox* involved California non-union-member public employees who objected to mid-year fees they were charged by the union which represented them for the union's political activities.[5] The *Knox* Court called into question the previous line of cases, but did not need to revisit or resolve the issue, as it could be resolved on the more narrow issue of whether an employee who objected to such mandatory fees had to opt in or opt out to refuse to pay for non-germane speech and activities:

Although the difference between opt-out and opt-in schemes is important, our prior

---

[5] In *Knox*, the matter involved a procedure whereby employees could object to portions of their dues which were spent on political activities, and seek a refund. This was called a "Hudson notice" after *Teachers v. Hudson*, 475 U.S. 292 (1986). Other than setting the stage for *Knox*, *Hudson* has no relevancy here. The SBM has a similar process for challenging the use of dues if a lawyer believes these to be outside of the *Keller* parameters. (See JSMF paragraph 54.) Because Plaintiff does not challenge the SBM for exceeding these parameters, and makes a facial challenge that any such compelled speech and association violates the First Amendment, the requirements for getting refunds before or after the fact of the speech and association are irrelevant.

cases have given surprisingly little attention to this distinction. Indeed, acceptance of the opt-out approach appears to have come about more as a historical accident than through the careful application of First Amendment principles.

The trail begins with dicta in *Street,* where we considered whether a federal collective-bargaining statute authorized a union to impose compulsory fees for political activities. 367 U.S., at 774, 81 S.Ct. 1784. The plaintiffs were employees who had affirmatively objected to the way their fees were being used, and so we took that feature of the case for granted. We held that the statute did not authorize the use of the objecting employees' fees for ideological purposes, and we stated in passing that "dissent is not to be presumed—it must affirmatively be made known to the union by the dissenting employee." *Ibid.* In making that offhand remark, we did not pause to consider the broader constitutional implications of an affirmative opt-out requirement. ***Nor did we explore the extent of First Amendment protection for employees who might not qualify as active "dissenters" but who would nonetheless prefer to keep their own money rather than subsidizing by default the political agenda of a state-favored union.***

In later cases such as *Abood* and *Hudson,* we assumed without any focused analysis that the dicta from *Street* had authorized the opt-out requirement as a constitutional matter. Thus in *Hudson* we did not take issue with the union's practice of giving employees annual notice and an opportunity to object to expected political expenditures. At the same time, however, we made it clear that the procedures used by a union to collect money from nonmembers must satisfy a high standard.

\*\*\*

Far from calling for a balancing of rights or interests, *Hudson* made it clear that any procedure for exacting fees from unwilling contributors must be "carefully tailored to minimize the infringement" of free speech rights. 475 U.S., at 303, 106 S.Ct. 1066. And to underscore the meaning of this careful tailoring, we followed that statement with a citation to cases holding that measures burdening the freedom of speech or association must serve a "compelling interest" and must not be significantly broader than necessary to serve that interest.

*Knox*, 567 U.S. at 312-4 (emphasis added, footnote omitted).

Because *Knox* noted the problems with the previous line of cases but did not need to resolve these problems to adjudicate the matter at hand, the matter subsequently came up again in *Harris v Quinn*, 573 U.S. 616 (2014). *Harris* dealt with home-care workers – personal assistants for medical care and hygiene - who were legislatively deemed public employees for the sole purpose of collective bargaining with the state. In all other aspects, these workers were in the private

employment of the person whose home they came to in order to assist in their care, although they received compensation from publicly-funded programs. In *Harris*, the Supreme Court described the previous line of cases and the insufficiency of those cases' First Amendment analysis:

> The *Hanson* Court dismissed the objecting employees' First Amendment argument with a single sentence. The Court wrote: "On the present record, there is no more an infringement or impairment of First Amendment rights than there would be in the case of a lawyer who by state law is required to be a member of an integrated bar." *Id*., at 238, 76 S.Ct. 714.
>
> This explanation was remarkable for two reasons. First, the Court had never previously held that compulsory membership in and the payment of dues to an integrated bar was constitutional, and the constitutionality of such a requirement was hardly a foregone conclusion. Indeed, that issue did not reach the Court until five years later, and it produced a plurality opinion and four separate writings. See *Lathrop v. Donohue,* 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961) (plurality opinion).
> Second, in his *Lathrop* dissent, Justice Douglas, the author of *Hanson,* came to the conclusion that the First Amendment *did not permit* compulsory membership in an integrated bar. See 367 U.S., at 878–880, 81 S.Ct. 1826. The analogy drawn in *Hanson,* he wrote, fails. "Once we approve this measure," he warned, "we sanction a device where men and women in almost any profession or calling can be at least partially regimented behind causes which they oppose." 367 U.S., at 884, 81 S.Ct. 1826. He continued:
>
>> "I look on the *Hanson* case as a narrow exception to be closely confined. Unless we so treat it, we practically give *carte blanche* to any legislature to put at least professional people into goose-stepping brigades. Those brigades are not compatible with the First Amendment." Id., at 884–885, 81 S.Ct. 1826 (footnote omitted).
>
> The First Amendment analysis in *Hanson* was thin, and the Court's resulting First Amendment holding was narrow. As the Court later noted, "all that was held in *Hanson* was that [the Railway Labor Act] was constitutional in its *bare authorization* of union-shop contracts requiring workers to give 'financial support' to unions legally authorized to act as their collective bargaining agents." *Street,* 367 U.S., at 749, 81 S.Ct. 1784 (emphasis added). The Court did not suggest that "industrial peace" could justify a law that "forces men into ideological and political associations which violate their right to freedom of conscience, freedom of association, and freedom of thought," or a law that forces a person to "conform to [a union's] ideology." *Hanson, supra,* at 236–237, 76 S.Ct. 714. The RLA did not compel such results, and the record in *Hanson* did not show that this had occurred.

*Harris*, 573 U.S. at 630-1.  *Harris* would go on at length to criticize *Abood* in its context regarding labor unions:

> The *Abood* Court's analysis is questionable. ...The *Abood* Court seriously erred in treating *Hanson* and *Street* as having all but decided the constitutionality of compulsory payments to a public sector union. … The *Abood* Court fundamentally misunderstood the holding in *Hanson*, ... *Abood* failed to appreciate the difference between the core union speech involuntarily subsidized by dissenting public-sector employees and the core union speech involuntarily funded by their counterparts in the private sector. … *Abood* failed to appreciate the conceptual difficulty of distinguishing in public-sector cases between union expenditures that are made for collective bargaining purposes and those that are made to achieve political ends. … *Abood* does not seem to have anticipated the magnitude of the practical administrative problems that would result in attempting to classify public-sector expenditures…

*Harris*, 573 U.S. at 635-7.

Despite *Harris*'s extensive critique of *Abood*, the issue was resolved without overturning or altering *Abood*.  Rather, as the *Harris* issue involved the distinction between public and private-sector employees, the *Harris* Court found that the personal assistants in question were not public employees – or, at least, not "full-fledged" public employees, and therefore *Abood* did not apply to them, and the First Amendment question was avoided.  "If we allowed *Abood* to be extended to those who are not full-fledged public employees, it would be hard to see just where to draw the line, and we therefore confine *Abood*'s reach to full-fledged state employees."  *Harris*, 573 U.S. at 638-9.

The constitutional question of compelled fees, speech, and association for public employees in the union context would wait until *Janus v. AFSCME*, __ U.S. __; 138 S. Ct. 2448 (2018) to be taken up again.  *Janus* explicitly overruled *Abood*.

> *Abood* was poorly reasoned. It has led to practical problems and abuse. It is inconsistent with other First Amendment cases and has been undermined by more recent decisions. Developments since *Abood* was handed down have shed new light on the issue of agency fees, and no reliance interests on the part of public-sector

unions are sufficient to justify the perpetuation of the free speech violations that *Abood* has countenanced for the past 41 years. *Abood* is therefore overruled.

*Janus,* 138 S. Ct. at 2460. *Janus* set forth a lengthy discussion of First Amendment rights and their

application to compelled speech:

> The First Amendment, made applicable to the States by the Fourteenth Amendment, forbids abridgment of the freedom of speech. We have held time and again that freedom of speech "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard,* 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); see *Riley v. National Federation of Blind of N. C., Inc.,* 487 U.S. 781, 796–797, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988); *Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 559, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 256–257, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974); accord, *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.,* 475 U.S. 1, 9, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (plurality opinion). The right to eschew association for expressive purposes is likewise protected. *Roberts v. United States Jaycees,* 468 U.S. 609, 623, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) ("Freedom of association ... plainly presupposes a freedom not to associate"); see *Pacific Gas & Elec., supra,* at 12, 106 S.Ct. 903 ("[F]orced associations that burden protected speech are impermissible"). As Justice Jackson memorably put it: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or *force citizens to confess by word or act their faith therein*." *West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (emphasis added).

> Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned. Suppose, for example, that the State of Illinois required all residents to sign a document expressing support for a particular set of positions on controversial public issues—say, the platform of one of the major political parties. No one, we trust, would seriously argue that the First Amendment permits this.

> Perhaps because such compulsion so plainly violates the Constitution, most of our free speech cases have involved restrictions on what can be said, rather than laws compelling speech. But measures compelling speech are at least as threatening.

> Free speech serves many ends. It is essential to our democratic form of government, see, *e.g., Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), and it furthers the search for truth, see, *e.g., Thornhill v. Alabama,* 310 U.S. 88, 95, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). Whenever the Federal Government or a State prevents individuals from saying what they think on important matters or

compels them to voice ideas with which they disagree, it undermines these ends.

When speech is compelled, however, additional damage is done. In that situation, individuals are coerced into betraying their convictions. Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, one of our landmark free speech cases said that a law commanding "involuntary affirmation" of objected-to beliefs would require "even more immediate and urgent grounds" than a law demanding silence. *Barnette, supra,* at 633, 63 S.Ct. 1178; see also *Riley, supra,* at 796–797, 108 S.Ct. 2667 (rejecting "deferential test" for compelled speech claims).

Compelling a person to *subsidize* the speech of other private speakers raises similar First Amendment concerns. *Knox, supra,* at 309, 132 S.Ct. 2277; *United States v. United Foods, Inc.,* 533 U.S. 405, 410, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001); *Abood, supra,* at 222, 234–235, 97 S.Ct. 1782. As Jefferson famously put it, "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhor[s] is sinful and tyrannical." A Bill for Establishing Religious Freedom, in 2 Papers of Thomas Jefferson 545 (J. Boyd ed. 1950) (emphasis deleted and footnote omitted); see also *Hudson,* 475 U.S., at 305, n. 15, 106 S.Ct. 1066. We have therefore recognized that a " 'significant impingement on First Amendment rights' " occurs when public employees are required to provide financial support for a union that "takes many positions during collective bargaining that have powerful political and civic consequences." *Knox, supra,* at 310–311, 132 S.Ct. 2277 (quoting *Ellis v. Railway Clerks,* 466 U.S. 435, 455, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984) ).

Because the compelled subsidization of private speech seriously impinges on First Amendment rights, it cannot be casually allowed. Our free speech cases have identified "levels of scrutiny" to be applied in different contexts, and in three recent cases, we have considered the standard that should be used in judging the constitutionality of agency fees. See *Knox, supra*; *Harris, supra*; *Friedrichs v. California Teachers Assn.,* 578 U.S. ——, 136 S.Ct. 1083, 194 L.Ed.2d 255 (2016) (*per curiam*) (affirming decision below by equally divided Court).

In *Knox,* the first of these cases, we found it sufficient to hold that the conduct in question was unconstitutional under even the test used for the compulsory subsidization of commercial speech. 567 U.S., at 309–310, 321–322, 132 S.Ct. 2277. Even though commercial speech has been thought to enjoy a lesser degree of protection, see, *e.g., Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.,* 447 U.S. 557, 562–563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), prior precedent in that area, specifically *United Foods, supra,* had applied what we characterized as "exacting" scrutiny, *Knox,* 567 U.S., at 310, 132 S.Ct. 2277, a less demanding test than the "strict" scrutiny that might be thought to apply outside the commercial sphere. Under "exacting" scrutiny, we noted, a compelled subsidy must "serve a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms." *Ibid.* (internal quotation

marks and alterations omitted).

In *Harris*, the second of these cases, we again found that an agency-fee requirement failed "exacting scrutiny." 573 U.S., at __, 134 S.Ct., at 2641. But we questioned whether that test provides sufficient protection for free speech rights, since "it is apparent that the speech compelled" in agency-fee cases "is not commercial speech." *Id.,* at ___, 134 S.Ct., at 2639.

Picking up that cue, petitioner in the present case contends that the Illinois law at issue should be subjected to "strict scrutiny." Brief for Petitioner 36. The dissent, on the other hand, proposes that we apply what amounts to rational-basis review, that is, that we ask only whether a government employer could reasonably believe that the exaction of agency fees serves its interests. See post, at 2489 (KAGAN, J., dissenting) ("A government entity could reasonably conclude that such a clause was needed"). This form of minimal scrutiny is foreign to our free-speech jurisprudence, and we reject it here. At the same time, we again find it unnecessary to decide the issue of strict scrutiny because the Illinois scheme cannot survive under even the more permissive standard applied in *Knox* and *Harris*.

*Janus*, 138 S.Ct. at 2463-5.

## III.   ANALYSIS

In *Janus*, the Supreme Court overruled *Abood* and explicitly required that compelled speech cases be evaluated under, at a minimum, exacting scrutiny - if not strict scrutiny. The *Janus* Court explicitly overruled the case whose precedent was the foundation for *Keller*, as well as use of the rational-basis review employed in *Keller*. For these reasons, *Keller* itself has been overruled and can no longer be considered good law. This is true whether or not we follow exacting scrutiny or strict scrutiny. Since strict scrutiny would also encompass the lesser exacting scrutiny, this brief will show that compelled bar dues and association cannot meet even this lesser scrutiny.

Assuming that the mission of the SBM, like the California Bar association, rises to the level of an important state interest as in *Lathrop*, *Keller* and *Abood*, would that justify such a First Amendment violation? "*Abood* held that a union could not expend a dissenting individual's dues for ideological activities not 'germane' to the purpose for which compelled association was justified: collective bargaining. Here the compelled association and integrated bar are justified by

the State's interest in regulating the legal profession and improving the quality of legal services."

*Keller*, 496 U.S., at 13.  From *Janus*, we get the exacting standard it must meet:

> [P]rior precedent in that area, specifically [*United States v United Foods,* 533 U.S. 405 (2001)], had applied what we characterized as "exacting" scrutiny, *Knox,* 567 U.S., at 310, 132 S.Ct. 2277, a less demanding test than the "strict" scrutiny that might be thought to apply outside the commercial sphere. Under "exacting" scrutiny, we noted, a compelled subsidy must 'serve a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms.' *Ibid.*

*Janus*, 138 S.Ct. at 2635.

The violation of Plaintiff's First Amendment rights is a very real concern.  The SBM, even under the *Keller* constraints, advocates and promotes positions related to the legal profession that are not universally held.  These go beyond actions specifically labeled as legislative position-taking.  Although this is a facial challenge, a few examples may be enlightening.  In October 2013, the SBM "sent a letter to Michigan Secretary of State Ruth Johnson requesting that she issue a declaratory ruling to create greater transparency for the sources of funding for judicial campaign advertisements."  The letter was reproduced in full in the SBM's publication sent to all attorneys, the Michigan Bar Journal.[6]  Neither the goal nor how such goals are pursued can be presumed to have universal concurrence.  "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned. Suppose, for example, that the State of Illinois required all residents to sign a document expressing support for a particular set of positions on controversial public issues—say, the platform of one of the major political parties. No one, we trust, would seriously argue that the First Amendment permits this." *Janus*, 138 S.Ct. at 2463-4.  The very fact

---

[6] https://www.michbar.org/file/barjournal/article/documents/pdf4article2280.pdf

that the SBM has advocated for a mandatory integrated bar[7] shows that it requires its members to put forth speech and advocacy with which they do not necessarily agree – as Plaintiff does not agree. "Suppose that a particular group lobbies or speaks out on behalf of what it thinks are the needs of senior citizens or veterans or physicians, to take just a few examples. Could the government require that all seniors, veterans, or doctors pay for that service even if they object? It has never been thought that this is permissible." *Janus*, 138 S.Ct. at 2466.

*Keller*'s claim, that there can be compelled speech as long as it is germane to the public interest it serves, does not stand after *Janus*. Even germane speech is of public concern, and individuals cannot be compelled to support it. "A similar problem arises with respect to speech that is germane to collective bargaining. The parties dispute how much of this speech is of public concern, but respondents concede that much of it falls squarely into that category. See Tr. of Oral Arg. 47, 65." *Janus*, 138 S.Ct. at 2473.

While it may be true that lawyers who disagree with SBM positions can voice their opinions separately, this does not overcome their right to be free from compulsion. The very fact the SBM can be said to speak for all lawyers amplifies its voice, and therefore drowns out individual objecting lawyers. Again, the *Janus* Court recognized this problem: "When a large number of employees speak through their union, the category of speech that is of public concern is greatly enlarged, and the category of speech that is of only private concern is substantially shrunk." *Janus*, 138 S.Ct. at 2473.

That the state could achieve its interests through a less restrictive method than mandating support for the SBM should be obvious from the fact that the majority of lawyers in the United States are not subject to a mandatory integrated bar. By the count of the American Bar Association,

---

[7] http://www.michbar.org/file/barjournal/article/documents/pdf4article3621.pdf

approximately 60% of lawyers in nineteen states are not required to join an integrated bar. Without such a requirement, there does not appear to be much evidence that restricting associational freedoms is the only way such goals can be achieved. Indeed, with California recently adopting a voluntary bar association, it would appear that the movement is away from the integrated bar model. With nineteen other states operating under such a model, that is conclusive evidence that it is possible, and there is no reason that Michigan could not operate in that manner as well.

Further, in Michigan, other professions are not subject to this mandatory requirement. Other professionals, including physicians, are licensed, but are not compelled to join or support a professional organization as a requirement for that license.[8] If the state interest in making sure that physicians are competent does not require that they join and fund a membership organization, then it is not necessary for attorneys.

If the state has an interest in monitoring and policing lawyers, can that interest be met with a less restrictive method? Again, the experience of other states shows that it can. Here, in Michigan, the two attorney discipline bodies operate independently of the SBM. SBM collects the portion of the dues destined for the Attorney Grievance Commission and the Attorney Discipline Board, but that is the extent of their collaboration. (See JSMF paragraph 65.) Both the Attorney Grievance Commission and the Attorney Discipline Board are controlled by the Michigan Supreme Court, and not the SBM. (See JSMF paragraphs 67, 68, and 69.) Even if these two separate entities cooperate with the SBM such that the SBM assists in ministerial functions with the two bodies, and then these two reimburse the SBM, these functions are such that they could be performed in-house by the two disciplinary bodies. The mere usefulness, or even efficiency, of

---

[8] The conditions for licensing medical doctors in Michigan can be found here:
https://www.michigan.gov/documents/lara/MD_Licensing_Guide_654158_7.pdf
Membership in a professional organization is not a requirement.

sharing ministerial tasks does not rise to a level that can overcome exacting scrutiny. "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014).

Even when acknowledging that the government has an interest in regulating the legal profession, there are numerous less restrictive ways that it could do this without injuring Plaintiff's and other attorneys' free speech and association rights. The SBM or an equivalent could be funded through the legislative appropriations process. It could be funded strictly by voluntary contributions, as in other states. Nor can the SBM claim that without mandatory membership and dues, it would be unfair for lawyers to benefit from its advocacy and functions. The "free rider" argument was dealt with in *Knox* and *Janus*, and rejected. "As we have noted, 'free-rider arguments ... are generally insufficient to overcome First Amendment objections.' *Knox*, 567 U.S., at 311, 132 S.Ct. 2277." *Janus*, 138 S. Ct. at 2466. Many less restrictive funding options are available that would comply with the exacting scrutiny standard. Again, one is not entitled to the benefit of an option that is more onerous to the protected right, just because "the chosen route is easier." *McCullen, supra*.

The actions the SBM takes through the Client Protection Fund cannot be said to be an interest so compelling that it requires mandatory membership and support. Such programs exist in all fifty states. Yet not all of these require mandatory membership. (See JSMF paragraph 29.) It is not akin to any kind of government program for the reason that is a discretionary program which confers no legal rights on any clients. (See JSMF paragraph 32.) It is not an insurance program nor an entitlement such as these are conceived of and administered by government agencies. Its sole purpose is to "promote public confidence in the administration of justice and

integrity of the legal profession," (See JSMF at 30, and Client Protection Fund Rules 1(A) and 13.) In that role it is more akin to a promotional activity to prevent loss of confidence in the legal system. Such a goal may be laudatory or not, but it is not one that attorneys should be required to support. And given the high hurdle that compelling speech and association must reach to overcome First Amendment objections, there are surely less intrusive ways to meet this goal. Requiring bonds or malpractice insurance as a condition of licensing, for instance.

The entire concept of the integrated bar cannot be said to be in accordance with the First Amendment as it was originally understood. As in *Janus*:

> [The defendant union] cannot point to any accepted founding-era practice that even remotely resembles the compulsory assessment of agency fees from public-sector employees. We do know, however, that prominent members of the founding generation condemned laws requiring public employees to affirm or support beliefs with which they disagreed. As noted, Jefferson denounced compelled support for such beliefs as " 'sinful and tyrannical,' " … and others expressed similar views.[8]
>
> > FN8 See, *e.g.,* Ellsworth, The Landholder, VII (1787), in Essays on the Constitution of the United States 167–171 (P. Ford ed. 1892); Webster, On Test Laws, Oaths of Allegiance and Abjuration, and Partial Exclusions from Office, in A Collection of Essays and Fugitiv[e] Writings 151–153 (1790).

*Janus*, 138 S.Ct. at 2466. Attorneys, just like public employees, should not be required to affirm or support such positions.

The voluntary nature of professional associations had been presumed to be their strength. The prominent 19th century observer of the United States, Alexis de Tocqueville, noted that Americans had a tendency to form voluntary associations to provide social coordination and solve the problems in society: "Americans of all ages, all stations in life, and all types of disposition are forever forming associations. There are not only commercial and industrial associations in which all take part, but other of a thousand different types—religious, moral, serious, futile, very general and very limited, immensely large and very minute. … [I]f they want to proclaim a truth or

propagate some feeling by the encouragement of a great example, they form an association. In every case, as the head of any new undertaking, where in France you would find the government or in England some territorial magnate, in the United States you are sure to find an association."[9]

*Janus* clearly overturned *Keller*. The rational basis used in *Keller* cannot be applied to the scrutiny of First Amendment violations. The standard must be, at the very least, exacting scrutiny. As the SBM cannot overcome exacting scrutiny, it surely cannot overcome the more stringent strict scrutiny. *Abood* was expressly overruled, and *Keller* fell with it. Like public-sector employees, attorneys cannot be compelled to join or fund organizations whose speech on their behalf they do not wish to support. For this reason, there is no triable issue of material fact. Under the facts submitted by the parties' JSMF, it can be shown that the mandatory fees and membership are not necessary to the state's interest in regulating the legal profession, and the state's interest can be met in other, less burdensome ways, just as they are in other states and with other professions. As a matter of law, these interests do not rise to the level of a compelling state interest. This court should grant Plaintiff's motion for summary judgment and declare that mandatory association and funding of an organization which speaks on Plaintiff's behalf is unconstitutional. Further, this court should enjoin the defendant officers from collecting dues or fees from Plaintiff for non-disciplinary-related actions unless she voluntarily signs a clear and knowing waiver which acknowledges that, by paying those dues, Plaintiff is waiving her constitutional right to free speech.

Respectfully submitted: May 15, 2020     **MACKINAC CENTER LEGAL FOUNDATION**

By \_\_/s/ Derk Wilcox_____

---

[9] Excerpt from online publication at: https://press.uchicago.edu/Misc/Chicago/805328.html  Last accessed May 13, 2020.

Derk A. Wilcox (P66177)
Patrick J. Wright (P54052)
140 West Main Street
Midland, Michigan 48640
(989) 631-0900
[wilcox@mackinac.org](mailto:wilcox@mackinac.org)
*Attorneys for Plaintiff*

**Certificate of Compliance**

In accordance with LCivR 7.2, the filer hereby certifies that this motion and brief comply with the word limit, and contain 10,760 words, as counted by Microsoft Word 2013.

/s/ Derk A, Wilcox

Derk A. Wilcox (P66177)
140 West Main Street
Midland, Michigan 48640
(989) 631-0900
wilcox@mackinac.org